**SO ORDERED.**

**SIGNED this 19th day of October, 2021.**



*Dale L. Somers*
_____
Dale L. Somers
United States Chief Bankruptcy Judge

Designated for online use but not print publication
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

Bear Communications, LLC,

         Debtor.

Case No. 21-10495-11

## Memorandum Opinion and Order
## Granting Motion for Derivative Standing

The Official Committee of Unsecured Creditors (the "Committee") of

Debtor Bear Communications, LLC seeks derivative standing as an exercise

of its powers under 11 U.S.C. § 1103(c)(5)[1] to assert claims on behalf of

Debtor's bankruptcy estate against Debtor's primary secured creditor The

_____

[1] Future statutory references are to title 11, the Bankruptcy Code, unless otherwise
stated.

Central Trust Bank ("Central Bank").[2] The Court follows the majority

position in the case law that derivative suits are available in certain

circumstances and concludes the Committee has met its burden to show those

circumstances are present here. As a result, the Court grants the

Committee's motion.[3]

## I.    Procedural Background

Debtor, a telecommunications company, filed its Chapter 11

bankruptcy petition on May 28, 2021. Brett Niles is the 100% equity owner

and chief executive officer of Debtor.[4] On June 29, 2021, the United States

Trustee formed the Committee under § 1102.[5] Central Bank is Debtor's

primary secured lender, and Debtor reports Central Bank is secured in "all"

its assets.[6] The Small Business Administration ("SBA") holds a relatively

small secured interest as well.

---

[2]  Central Bank notified the Court of a reorganization and merger on October 12, 2021, changing its name from Central Bank of the Midwest to The Central Trust Bank. Doc. 349.

[3]  Doc. 280. The Committee appears by James R. Irving of Dentons Bingham Greenbaum LLP. Central Bank appears by Paul Croker and Erin Edelman of Armstrong Teasdale LLP.

[4]  Doc. 1 p. 61; Doc. 4; Doc. 80 p. 158. The parties reported on September 27, 2021, in connection with a dispute about the use of cash collateral, that Mr. Niles would be resigning as chief executive officer.

[5]  Section 1102 directs the United States Trustee to "appoint a committee of creditors holding unsecured claims" in Chapter 11 cases and provides the procedure for that process.

[6]  Doc. 80 p. 17.

2

Debtor did not file its Schedules until June 11, 2021, and therein disclosed ten vehicles valued at $302,734.27[7] and forty-four trailers valued at $270,993.27.[8] The Committee alleges based upon a production of documents by Central Bank that there are five additional trailers that were not listed. The Committee also believes there are additional undisclosed motor vehicles. Debtor's Schedules also disclosed two checking accounts at filing: one at Central Bank with a balance of $10,000 and one at Bank of America with a balance of $200,640.03.[9]

Throughout the case the parties have litigated Debtor's use of cash collateral. A Fifth Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection was entered August 17, 2021 ("Fifth Interim Order"), granting use of cash collateral through October 29, 2021.[10] Under the terms of the Fifth Interim Order the parties agreed to certain positions regarding security. The Fifth Interim Order states, in pertinent part:

> The [Committee], or other party in interest, as applicable, shall have until September 6, 2021 (the "Challenge Deadline") to investigate and, if necessary, challenge the priority, validity, amount, or secured status of any prepetition security and liens granted to [Central Bank] or the SBA by the Debtor (the "Challenge"). The [Committee], or other party in interest, as applicable, may commence a Challenge by initiating a contested matter or adversary proceeding asserting a Challenge, or by filing

---

[7] *Id.* p. 6 and p. 7.
[8] *Id.* p. 6 and p. 7-8.
[9] *Id.* p. 1.
[10] Doc. 212.

a motion for standing to pursue such a proceeding. Upon a motion to the Court by the [Committee], the Challenge Deadline may be extended by 30 days. [Central Bank] and the SBA reserve their right to object to such extension motion. The Challenge Deadline may otherwise be extended only for cause or by the agreement of [Central Bank], the SBA, and the [Committee]. After the expiration of the Challenge Deadline and to the extent no Challenge proceeding is timely commenced or remains pending, the [Committee], the Debtor, and all parties in interest shall be barred and enjoined from contesting the priority, validity, amount, and secured status of any prepetition security and liens granted to [Central Bank] or the SBA by the Debtor, and such prepetition liens granted to [Central Bank] or the SBA by the Debtor shall be deemed valid, binding, and enforceable.[11]

On August 30, 2021, Central Bank filed a proof of claim asserting a secured claim of $5,899,295.15.[12] On September 2, 2021, the Committee demanded—by letter to Debtor—that Debtor file a complaint challenging the perfection of Central Bank's liens on vehicles, trailers, and Debtor's Bank of America bank account, avoiding those liens, and recovering the avoided liens. The Committee also demanded Debtor file a complaint seeking turnover of property of the estate from Central Bank, recovery of preferential payments, and relief under the equitable doctrine of marshaling, also naming Big Bear Leasing, Inc. and Brett Niles as potential defendants on the marshaling

---

[11] *Id.* p. 16-17. The Fifth Interim Order is the subject of further litigation, for reasons not pertinent here, and modification of it is pending. *See* Doc. 302 and responses thereto.

[12] Proof of Claim No. 81-1.

claim. The Committee gave Debtor until September 5, 2021 to file a complaint.[13] Debtor did not pursue a complaint in its own name.

The Committee then filed the motion for derivative standing that is now under consideration. In the proposed complaint attached to that motion, the Committee alleges Debtor, Big Bear Leasing, Inc, and Big Bear Investments entered into a loan agreement, commercial security agreement, and promissory note with Central Bank on March 8, 2016, with an original principal amount of $12 million. Under these loan documents, Debtor granted Central Bank a security agreement in substantially all of its assets. A separate security agreement was also entered by Big Bear Leasing, Inc, granting a security interest in its assets. And then on January 5, 2021, Brett Niles executed a guaranty agreement for the debt in favor of Central Bank, secured by Mr. Niles' personal assets.

The Committee alleges Central Bank filed UCC-1 financing statements for Debtor's assets but failed to perfect its security agreement in certain of Debtor's motor vehicles[14] and in Debtor's Bank of America account.[15] Some of

---

[13] Doc. 315-1 p. 2.

[14] The Committee alleges certain motor vehicles titled in Kansas, Ohio, Alabama, Missouri, Arizona, and Tennessee are unperfected because of no notation on the certificate of title; namely, six vehicles with a total value of $142,519.27 and thirty-one trailers with a total value of $176,415.97. Doc. 280-1 p. 19.

[15] The Committee alleges there is no deposit account control agreement concerning the Bank of America account that would grant Central Bank control over the account.

these vehicles were not identified on Debtor's Schedules. Central Bank conducted both prepetition and postpetition sweeps of the Bank of America account.

The Committee also alleges that Mr. Niles is not only the equity owner and executive officer of Debtor but is also the 100% equity owner of Big Bear Leasing, Inc. and Big Bear Investments and the officer exercising control of all these entities. The Committee claims the three business entities (Debtor, Big Bear Leasing, Inc and Big Bear Investments) are all alter egos of Mr. Niles and of each other. Neither Big Bear Leasing, Inc. nor Big Bear Investments maintain corporate formalities and the funding, accounting, and operations of both are commingled with Debtor's operations, as evidenced by:

- Big Bear Leasing, Inc. and Big Bear Investments have no employees. Both entities utilize Debtor's employees for operations. Debtor's funds are used for both entities' costs and expenses, including, for example, property taxes and operating expenses incurred by Big Bear Investments in connection with an investment in The Oaks game ranch. Debtor's funds are also used to pay personal expenses of Mr. Niles.

- There are no management agreements or cost sharing agreements in place between the various entities to compensate or reimburse Debtor for such costs or expenses.

- Debtor, Big Bear Leasing, Inc. and Big Bear Investments do not accurately track or account for intercompany loans or transfers.

The Committee claims that certain assets identified on Debtor's Schedules are actually titled to Big Bear Leasing, Inc.

The Committee alleges that a little over two months prepetition, on March 16, 2021, Mr. Niles cause Debtor to transfer to him $1 million. At Debtor's § 341 meeting of creditors, Mr. Niles testified he did not remember what he did with the $1 million. At a subsequent Rule 2004 exam, Mr. Niles testified that he used $600,000 of the funds to purchase a new home and the remainder was used for personal expenses, a repayment of a personal loan, and payment back to Debtor. The Committee alleges the $1 million transfer was made with the actual intent to hinder, delay, or defraud creditors, and that Debtor did not receive reasonably equivalent value in exchange.

Finally, the Committee alleges Mr. Niles is also the 75% equity owner in, and officer exercising control over, an entity called Open Country LLC. This entity was formed March 11, 2021—five days prior to the $1 million transfer. The entity—like Debtor—provides long haul fiber construction services. The Committee alleges Mr. Niles capitalized Open Country LLC with approximately $750,000 shortly after receiving the $1 million transfer from Debtor. Prepetition, Debtor was performing on contracts to Midcontinent Communications and ImOn. The Committee alleges Mr. Niles caused Debtor to assign or transition Debtor's prepetition contracts with these companies to Open Country LLC and that Open Country LLC is now not only performing on these or similar contracts but also utilizing Debtor's

employees to do so and the expenses of these employees is being borne by Debtor postpetition.

The Committee's proposed complaint alleges multiple causes of action, as follows:

- Count 1: Against Central Bank, challenging Central Bank's perfection of its security interest in Debtor's Bank of America account.

- Count 2: Against Central Bank, challenging Central Bank's perfection of a security interest in the contested motor vehicles.

- Count 3: Against Central Bank, seeking avoidance of the unperfected liens on the Bank of America account and motor vehicles pursuant to § 544(a).

- Count 4: Against Central Bank, seeking preservation of the unperfected liens and security agreements for the bankruptcy estate under § 551.

- Count 5: Against Central Bank, seeking avoidance as a preferential transfer under § 547 the prepetition sweeps of the Bank of America account done within ninety days of the petition date due to the avoidable prepetition lien of Central Bank on that account.

- Count 6: Against Central Bank, seeking recovery of the transfers avoided under § 544 and § 547.

- Count 7: Against Central Bank, seeking turnover of the amount taken by Central Bank in its postpetition sweeps of the Bank of America account under § 542(a).

- Count 8: Against Central Bank, Big Bear Leasing, Inc., and Mr. Niles, requesting application of the equitable doctrine of marshaling such that Central Bank is required to satisfy the amounts due from Debtor under the parties' loan agreements by first exhausting recovery on collateral belonging to Big Bear Leasing, Inc. and Mr. Niles.

Central Bank is the only party who has filed an opposition to the motion for derivative standing.

## II. Analysis

Matters concerning the "administration of the estate" are core proceedings under 28 U.S.C. § 157(b)(2)(A), over which this Court may exercise subject matter jurisdiction.[16]

### A. Case Law about Derivative Standing

The Committee's motion for derivative standing seeks authority from this Court to assert causes of action that include statutory claims that would generally be asserted by Debtor's bankruptcy estate. A committee of creditors is authorized by the Code to:

> (1) consult with the trustee or debtor in possession concerning the administration of the case;
>
> (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
>
> (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

---

[16] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1 *printed in* D. Kan. Rules of Practice and Procedure (March 2018).

(4) request the appointment of a trustee or examiner under section 1104 of this title; and

(5) perform such other services as are in the interest of those represented.[17]

The Code therefore grants a committee of creditors significant powers, but does not directly address the power of a committee to bring claims that would typically be asserted by the debtor in possession; the statutes creating the claims in the Committee's proposed complaint grant power to bring the causes of action to the trustee or debtor in possession.[18] Many courts have considered whether a committee of creditors has an implied right, through derivative standing, to pursue claims that would typically be pursued by a trustee or debtor in possession.

The discussion of case law in this area generally begins with the Supreme Court's decision in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*[19] In that case, the Supreme Court analyzed the language of § 506(c), which grants power to "the trustee" to recover from "property securing

---

[17] 11 U.S.C. § 1103(c).

[18] *E.g.*, 11 U.S.C. § 542(a) (requiring entities to "deliver to the trustee" property that is beneficial to the estate), § 544 (giving "the trustee" certain rights and powers to avoid voidable transfers of property), § 547 (permitting "the trustee" to avoid certain statutorily defined preferential transfers) and § 1107(a) (giving a Chapter 11 debtor in possession the rights and powers of a trustee).

[19] 530 U.S. 1 (2000).

an allowed secured claim" the costs of preserving that property,[20] and whether an administrative claimant could recover under that provision or only the trustee.[21] The Supreme Court concluded that because the statute specified the party to take action, exclusivity to that party was intended, especially where the Code overall granted the specified party a unique role in bankruptcy proceedings.[22] In a footnote, the Supreme Court noted it was not addressing whether a bankruptcy court could "allow other interested parties to act in the trustee's stead" or the practice of "allowing creditors or creditors' committees a derivative right to bring avoidance actions when the trustee refuses to do so, even though the applicable Code provisions, see 11 U.S.C. §§ 544, 545, 547(b), 548(a), 549(a), mention only the trustee."[23] The Supreme Court limited its holding to rejecting the ability of the administrative claimant to assert "an independent right" to use the statute.[24]

Shortly after the decision in *Hartford Underwriters Ins. Co.*, the Tenth Circuit BAP considered the issue of derivative standing for a claim under §

---

[20]  Section 506(c) states: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

[21]  530 U.S. at 6.

[22]  *Id.* at 6-7.

[23]  *Id.* at 13 n.5.

[24]  *Id.*

548 in *United Phosphorus, Ltd. v. Fox (In re Fox).*[25] In *Fox*, the Tenth Circuit

BAP addressed whether creditors may bring derivative suits on behalf of the

bankruptcy estate in light of *Hartford Underwriters Ins. Co.* and concluded

the Supreme Court's analysis foreclosed the derivative suit. The Tenth

Circuit BAP reasoned that the Code was "explicit, unambiguous and

absolute" that "the trustee" could bring an action under § 548, and therefore

the *Hartford Underwriters Ins. Co.* decision required the plain language to be

followed.[26] The Tenth Circuit BAP noted the footnote from *Hartford*

*Underwriters Ins. Co.* recognizing the practice of derivative suits after

obtaining bankruptcy court permission when a trustee refuses to act, but

concluded the Supreme Court's language used in assessing the plain

language of § 506(c) was "so clear and compelling" that the BAP "was

convinced it would apply the same reasoning" and "reach the same

conclusion" regarding derivative actions under § 548 if the question had been

presented.[27]

---

[25]  305 B.R. 912 (10th Cir. BAP 2004). Section 548(a)(1) states: "The trustee may
avoid any transfer (including any transfer to or for the benefit of an insider under
an employment contract) of an interest of the debtor in property, or any obligation
(including any obligation to or for the benefit of an insider under an employment
contract) incurred by the debtor, that was made or incurred on or within 2 years
before the date of the filing of the petition[.]"
[26]  305 B.R. at 914-16.
[27]  *Id.* at 915.

The Tenth Circuit has not itself directly addressed derivative suits. A few years after the BAP's decision in *Fox*, the Tenth Circuit noted the issue, but not the *Fox* case, in *Hill v. Akamai Technologies, Inc. (In re MS55).*[28] In the *MS55* case, the Tenth Circuit considered a bankruptcy case converted from Chapter 11 to Chapter 7 and whether the waiver by the then Chapter 11 debtor-in-possession to bring avoidance actions against a secured creditor survived the conversion to Chapter 7 such that the trustee was barred from suit.[29] The prior waiver reserved the right of the Chapter 11 unsecured creditors' committee to bring suit, but the committee did not so act.[30] Addressing the Chapter 7 trustee's argument that he inherited the unexhausted right retained by the creditors' committee to bring an avoidance action—which it rejected because the trustee succeeded only to the debtor's rights, not the committee's rights—the Tenth Circuit noted that "courts have permitted creditors' committees to bring actions in the name of the debtor, usually only in connection with actions against insiders or other persons that the debtor in possession has refused or is reluctant to sue," and concluded that because of this, "any rights the creditors' committee has to an avoidance action are derivative of the debtor and the estate's claims."[31] Despite this

---

[28]  477 F.3d 1131 (10th Cir. 2007).
[29]  *Id.* at 1134-35.
[30]  *Id.* at 1134.
[31]  *Id.* at 1139 (internal quotations omitted).

Case 21-10495    Doc# 359    Filed 10/19/21    Page 13 of 27

statement, the Tenth Circuit then noted in a footnote, however, that a "committee's right to bring an avoidance action is not without question," citing the *Hartford Underwriters Ins. Co.* decision.[32] Ultimately, the Tenth Circuit declined to decide the issue: "Because we conclude the trustee does not succeed to the committee's rights . . . we need not discuss the availability of these rights since *Hartford*. It is enough to note that to the extent the creditors' committee has a right to initiate an avoidance action, its right is derivative of the debtor-in-possession's right and is exercised on behalf of the bankruptcy estate."[33]

The Tenth Circuit has not addressed derivative actions since the *In re MS55* case. Despite this, there is a plethora of case law from other circuits, and the other circuits who have squarely addressed the issue post-*Hartford Underwriters Ins. Co.* have all permitted creditors or creditors' committees to maintain derivative suits when the trustee or debtor in possession has refused and the creditor or committee obtains the permission of the bankruptcy court. Some of those circuit court decisions have reached this decision without addressing the *Hartford Underwriters Ins. Co.* case.[34] Other

---

[32] *Id.* at 1139 n.9.

[33] *Id.*

[34] *See, e.g.*, *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 863 (5th Cir. 2013) (noting the "general rule" that a creditor "has the right to seek authority to pursue causes of action on behalf of a debtor-in-possession" and citing prior Fifth Circuit authority in *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988), for this "well-settled" law; *Jones v. Phillip*

circuit courts have directly addressed *Hartford Underwriters Ins. Co.* and determined it does not control.[35] For example, as the Sixth Circuit explained:

> [A]voidance provisions—make no reference to derivative standing and state only that "the trustee may" bring certain avoidance and recovery actions. If these were the only relevant sections of the Code, *Hartford Underwriter*'s interpretation of "the trustee may" in § 506(c) would weigh strongly against derivative standing given the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning."

*Schlosberg, a Prof'l Corp. (In re Jones)*, 178 Fed. App'x 662, 664 (9th Cir. 2006) ("The district court properly held that the bankruptcy court did not err in allowing [the creditor] to bring the avoidance action after the trustee refused to do so."); *Enodis Corp. v. Emp'rs Ins. of Wausau (In re Consol. Indus. Corp.)*, 360 F.3d 712, 716-17 (7th Cir. 2004) ("Bankruptcy law does allow a creditor to bring a derivative claim on behalf of the estate, but only in limited circumstances. To do so, a creditor must show that the trustee has unjustifiably refused the creditor's demand to pursue a colorable claim and obtain leave from the bankruptcy court to proceed." (citing *Fogel v. Zell*, 221 F.3d 955, 965-66 (7th Cir. 2000))).

[35] *See, e.g.*, *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 245 (6th Cir. 2009) ("we reaffirm the continued vitality after *Hartford Underwriters* of granting derivative standing to creditors to pursue avoidance actions on behalf of the estate and hold that this practice is available in both Chapter 11 and Chapter 7 proceedings"); *PW Enters., Inc. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 898, 898 n.7 (8th Cir. 2008) ("derivative standing is available to a creditor to pursue avoidance actions when it shows that a Chapter 7 trustee (or debtor-in-possession in the case of Chapter 11) is 'unable or unwilling' to do so"; noting in a footnote that "We agree with the Third Circuit that the Supreme Court's decision in *Hartford Underwriters Ins. Co.* . . . does not foreclose derivative standing under the Bankruptcy Code"); *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 177-78, 181-82 (2d Cir. 2005) (noting that under *Hartford Underwriters Ins. Co.* a creditors' committee cannot rely on § 1109(b) for independent standing but holding that a creditors' committee may be granted standing to pursue a cause of action when debtor-in-possession's refusal to do so was unjustifiable); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 553, 558 (3d Cir. 2003) (en banc) (finding *Hartford Underwriters Ins. Co.* "markedly different" than a derivative action to pursue an avoidance action for the benefit of the bankruptcy estate and concluding derivative standing was available to a creditors' committee when a debtor-in-possession's refusal to pursue an avoidance action was unreasonable).

Case 21-10495   Doc# 359   Filed 10/19/21   Page 15 of 27

> However, our analysis is not so cribbed, because other provisions of the Bankruptcy Code, as well as pre-Code practice, clearly contemplate the equitable power of bankruptcy courts to authorize creditors, in appropriate instances, to bring claims on behalf of the bankruptcy estate.[36]

The Sixth Circuit concluded that because § 503(b)(3)(B) provides that creditors may be compensated on a priority basis for efforts in recovering property "for the benefit of the estate,"[37] it shows Congressional approval of "the practice of permitting creditors, with court authorization, to pursue claims on behalf of bankruptcy debtors."[38] In addition, the Sixth Circuit reasoned that Congress was aware of the practice of derivative standing at the time § 503(b)(3)(B) was incorporated into the Code and that the Code section would be meaningless unless derivative standing existed.[39] Finally, the Sixth Circuit reasoned that a bankruptcy court has the authority as an exercise of its equitable power to ensure the Code's provisions for the recovery of assets to maximize the bankruptcy estate.[40]

---

[36] *In re Trailer Source, Inc.*, 555 F.3d at 240 (internal citation omitted).

[37] Section 503(b)(3)(B) states: "After notice and a hearing, there shall be allowed administrative expenses . . . including . . . (3) the actual, necessary expenses, other than compensation and reimbursement specified [for reasonable compensation for professional services], incurred by . . . (B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor."

[38] *In re Trailer Source, Inc.*, 555 F.3d at 240.

[39] *Id.* at 242; *In re Cybergenics Corp.*, 330 F.3d at 567 ("when they are paired with § 503(b)(3)(B), it becomes unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate").

[40] *In re Trailer Source, Inc.*, 555 F.3d at 242, 242-43 ("this equitable remedy effectuates Congress's intent that fraudulently transferred property be recovered for

16

Other circuit courts have reasoned that § 1103(c)(5), which as noted above, says that creditors' committees may "perform such other services as are in the interest of those represented" grants permission for derivative standing to a committee.[41] One BAP court noted that § 1107(a), which states that a debtor-in-possession "shall perform all the functions and duties" of a trustee, subject to "such limitations or conditions as the court prescribes," also provides support for derivative standing.[42] Other circuits and BAP's also rely at least in part on § 1109(b), which states that creditors' committees "may raise and may appear and be heard on any issue in a case" under Chapter 11.[43] Suffice to say most bankruptcy courts and appellate courts considering the issue have concluded the practice of granting derivative

the bankruptcy estate"); *In re Cybergenics Corp.*, 330 F.3d at 568 ("We believe that the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers.").

[41] *In re Smart World Techs., LLC)*, 423 F.3d at 183 n.27 ("This court has previously recognized that § 1103(c)(5) provides a statutory basis for granting derivative standing in some cases."); *In re Cybergenics Corp.*, 330 F.3d at 563 (stating that § 1103(c)(5) provides "clear evidence that Congress envisioned a central role for creditors' committees in Chapter 11" and "indirect evidence that Congress granted bankruptcy courts the power to confer derivative standing upon those committees").

[42] *Jefferson County Bd. of County Commissioners v. Voinovich (In re The V Companies)*, 292 B.R. 290, 295 (6th Cir. BAP 2003).

[43] *In re Cybergenics Corp.*, 330 F.3d at 566 ("Sections 1109(b) and 1103(c)(5), taken together, evince a Congressional intent for committees to play a robust and flexible role in representing the bankruptcy estate, even in adversarial proceedings."); *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir. 1985) ("Most bankruptcy courts that have considered the question have found an implied, but qualified, right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession under 11 U.S.C. §§ 1103(c)(5) and 1109(b)."); *In re The V Companies*, 292 B.R. at 295.

17

standing in appropriate circumstances was not foreclosed by *Hartford Underwriters Ins. Co.*[44]

This court addressed derivative standing in *Village of Overland Pointe, LLC v. Terra Bentley II, LLC (In re Terra Bentley II, LLC).*[45] In *Terra Bentley II, LLC*, a creditor sought to bring an adversary action against the debtor under the Kansas Uniform Fraudulent Transfer Act to avoid a mortgage the debtor gave to a separate creditor prepetition.[46] This Court recognized the "many courts" that had permitted derivative standing under certain circumstances for creditors to pursue claims otherwise belonging to a trustee or debtor-in-possession, although it concluded the factual predicate for derivative standing had not been satisfied in that case.[47] The Court stated: "The Tenth Circuit has apparently not yet ruled on the question. No Circuit court appears to have concluded derivative standing for creditors is never permissible, though, and the Court sees no reason to believe the Tenth Circuit would disagree with the unanimous view of the Circuits that have decided the question."[48]

---

[44] *See, e.g.*, *In re Roman Catholic Church of Archdiocese of Santa Fe*, 621 B.R. 502, 506-08 (Bankr. D.N.M. 2020) (providing extensive summary of development of case law and citing cases).

[45] No. 09-23107, 2011 WL 808190 (Bankr. D. Kan. Mar. 2, 2011).

[46] *Id.* at *1.

[47] *Id.* at *4.

[48] *Id.* Admittedly, the Court did not address the Tenth Circuit BAP's position in *Fox.*

18

The Court continues to believe that the Tenth Circuit would join with other circuits in recognizing derivative standing suits in limited circumstances where the trustee or debtor-in-possession has unjustifiably refused to pursue the proposed claims. The decision by the Tenth Circuit BAP in *Fox* is a minority position, provided shortly after *Hartford Underwriters Ins. Co.* was decided and without the benefit of the more than twenty years of case law development that has since occurred.[49] As a result, if the Committee can carry its burden to show it petitioned Debtor to bring the claims, Debtor unjustifiably refused, and its claims are colorable,[50] this Court will grant permission to bring a derivative suit.

## B. Has the Committee Established Derivative Standing

The Committee demanded Debtor bring the claims now stated in its proposed complaint, thereby satisfying the requirement that it first petition

---

[49] In *In re Quick*, the Court indicated it considered Tenth Circuit BAP decisions to be persuasive authority that "should be followed in the absence of compelling reasons to depart." *In re Quick*, No. 07-2191, 2008 WL 474266, at *3 (Bankr. D. Kan. Feb. 14, 2008). As described in the text, the Court believes compelling reasons are present here.

[50] *In re Racing Servs., Inc.*, 540 F.3d at 900 ("We therefore hold, to establish derivative standing, a creditor must show: (1) it petitioned the trustee to bring the claims and the trustee refused; (2) its claims are colorable; (3) it sought permission from the bankruptcy court to initiate an adversary proceeding; and (4) the trustee unjustifiably refused to pursue the claims. We expect in most cases creditors will readily satisfy the first three elements without much difficulty—petitioning the trustee and bankruptcy court ought to be mere formalities."). By filings its motion, the Committee has satisfied the requirement that it seek permission from the bankruptcy court prior to bringing the derivative action.

Debtor to bring the claims.[51] The remaining questions are whether Debtor's refusal to pursue the claims was unjustifiable and whether the claims are colorable.

Claims are colorable if they would survive a motion to dismiss.[52] Under the familiar motion to dismiss standards, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[53] A claim is facially plausible if the factual content plead, as opposed to legal conclusions made, allow a court to draw the reasonable inference that the stated claim is present.[54] The Court does not "weigh potential evidence that the parties might present at trial" but instead assesses whether the proposed complaint "is legally sufficient to state a claim for which relief may be granted" if the factual allegations are "accepted as true and viewed in the light most favorable" to the movant.[55]

---

[51] The Committee's correspondence to Debtor demanding claims be brought is located at Doc. 315.

[52] *In re Racing Servs., Inc.*, 540 F.3d at 900 ("a creditor's claims are colorable if they would survive a motion to dismiss").

[53] *Williams v. Meyer (In re Williams)*, 438 B.R. 679, 683 (10th Cir. BAP 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

[54] *Id.* (internal quotations omitted); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

[55] *In re Expert South Tulsa, LLC*, 522 B.R. 634, 651 (10th Cir. BAP 2014) (internal quotations omitted). In its initial response to the Committee's motion, Central Bank responds simply that it "possesses valid and perfected liens" and that the doctrine of marshaling is limited and it has already employed methods to recover against Big

Counts 1 through 4 of the Committee's proposed complaint challenge Central Bank's perfection of security interests in Debtor's Bank of America account and certain motor vehicles, avoidance of those unperfected liens under § 544(a), and preservation of the unperfected liens for the bankruptcy estate under § 551. For each alleged unperfected security interest, the Committee identifies the facts leading it to believe the security interest is not perfected, the state law upon which it relies that controls perfection of a security interest in the items, and the benefit to the bankruptcy estate of avoiding those transfers. This is sufficient to state colorable claims.[56] Regarding the Bank of America account, Central Bank presents a factual dispute about the source of the funds in the account,[57] but again, the Court does not weigh evidence at this point.

---

Bear Leasing, Inc. and Mr. Niles with a state court action. Doc. 301 p. 3-4. But again, as stated above, at this point, the Court is asking whether the stated claims are colorable. The merits of those claims beyond what the Court would typically employ at the motion to dismiss stage is left for development through the adversary proceeding that would be filed after the motion for derivative standing is granted.

[56] *E.g.*, *Hamilton v. Wash. Mut. Bank FA (In re Colon)*, 563 F.3d 1171, 1173-74 (10th Cir. 2009) (describing the § 544(a) cause of action); *AG New Mexico v. Borges (In re Borges)*, 510 B.R. 306, 323 (10th Cir. BAP 2014) (detailing a cause of action for a Chapter 11 debtor in possession under § 544(a)).

[57] Doc. 321 p. 3 (arguing that Central Bank has a perfected security interest in the funds because the funds in the Bank of America account were proceeds of accounts receivables in which Central Bank had a perfected security interest); Doc. 333 p. 4 (arguing "the testimony at the meeting of creditors and Bankruptcy Rule 2004 examinations suggests that all of the amounts in the BOA Account may not have been payments on accounts receivable but that they could have come from other sources as well").

Count 5 seeks avoidance as preferential transfers the amounts swept from Debtor's Bank of America account by Central Bank in the ninety days prepetition. Here, the Committee's proposed complaint alleges Central Bank took money belonging to Debtor to satisfy its loan with Debtor despite having no property interest in the funds, in the ninety days prior to filing, when Debtor was insolvent. Again, this is sufficient to state a colorable claim.[58] Central Bank argues the Committee failed to provide specificity regarding the amounts transferred, dates transferred, and the identity of the transferor and transferee,[59] but the Court concludes that a fair reading of the proposed complaint indicates that the Committee has stated colorable claims that can and should be developed factually through the litigation of those claims.

Count 6 simply alleges that the transfers avoided under § 544 or § 547 be recovered for the benefit of Debtor's bankruptcy estate. Section 550 makes the initial transferee of an avoided transfer strictly liable for the value of the

---

[58] *E.g.*, *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1196 (10th Cir. 2002) ("Under the terms of § 547, a transfer is avoidable if it: (1) is of an interest of the debtor in property; (2) is for the benefit of a creditor; (3) is made for or on account of an antecedent debt owed by the debtor before the transfer was made; (4) is made while the debtor is insolvent; (5) is made on or within ninety days before the date the bankruptcy petition was filed; and (6) allows the creditor to receive more than the creditor would otherwise be entitled to receive from the bankruptcy estate.").

[59] Doc. 321 p. 2.

property transferred,[60] and the Committee alleges Central Bank is an initial transferee. Again, this count states a colorable claim.

Count 7 of the proposed complaint seeks turnover of the amount taken by Central Bank in its *post* petition sweeps of the Bank of America account under § 542(a). The Committee alleges Central Bank conducted regular sweeps of the Bank of America account after Debtor's bankruptcy filing, taking funds that were properly part of Debtor's bankruptcy estate, upon which Central Bank had no property interest. The Committee alleges the amounts taken were not of inconsequential value. These allegations support a claim for turnover under § 542(a),[61] and therefore the turnover claim is colorable.

Finally, Count 8 of the Committee's proposed complaint is against Central Bank, Big Bear Leasing, Inc., and Mr. Niles, requesting application of the equitable doctrine of marshaling such that Central Bank is required to satisfy the amounts due from Debtor under the parties' loan agreements by first exhausting recovery on collateral belonging to Big Bear Leasing, Inc. and Mr. Niles. Marshaling is an equitable doctrine, and its purpose "is to

---

[60]  *Id.* at 1202 (describing recovery under § 550 and the defenses thereto).

[61]  *E.g.*, *In re Rosales*, 621 B.R. 903, 917 (Bankr. D. Kan. 2020) ("The trustee must establish the following elements of turnover under § 542(a): (1) the property sought to be turned over is property of the estate; (2) the party against whom turnover is sought is an 'entity;' (3) the entity was in possession, custody, or control of the property during the case; and (4) the trustee may use or sell the property.").

prevent the arbitrary action of a senior lienor from destroying the rights of a

junior lienor or a creditor having less security."[62] To invoke the doctrine of

marshaling, the following elements must be shown: "(1) the existence of two

or more creditors competing against the same debtor; (2) the existence of two

or more funds belonging to the debtor; and (3) the legal right of at least one

creditor to satisfy its claim against either of the funds, when the other

creditor has access to only one fund."[63] The Committee alleges Debtor has the

rights and powers of a judgment lien and execution creditor under § 544, and

that therefore Debtor has the powers of a junior creditor compared to Central

Bank as senior creditor. The Committee also alleges Central Bank has

interests in collateral that is property of the bankruptcy estate and in

collateral that is property of Big Bear Leasing, Inc. and Mr. Niles. The

Committee argues Central Bank should be required to exhaust its recovery

on assets belonging to non-debtor entities Big Bear Leasing, Inc. and Mr.

Niles, prior to recovering against collateral that is property of the bankruptcy

estate, due to alleged inequitable conduct and actual or constructive fraud

described above. The Committee argues this Court should follow cases

extending the application of the marshaling doctrine to situations where a

---

[62] *In re Blagg*, 372 B.R. 502, 506 (Bankr. D. Kan. 2007) (internal quotation
omitted).
[63] *Redmond v. Carson (In re Carson)*, 374 B.R. 247, 249 (10th Cir. BAP 2007).

non-debtor entity is an alter ego of the debtor or where the non-debtor has engaged in inequitable conduct.[64]

Central Bank challenges whether the marshaling doctrine should be applied on the facts present herein. Central Bank argues that extension of the marshaling doctrine to the circumstances the Committee alleges are present should not be permitted, and that it would be prejudiced by the application of the marshaling doctrine.[65] The Court readily acknowledges that these are difficult questions that will have to be resolved, but concludes it is too early to resolve them at this juncture, without the benefit of further factual development. Again, at this point, the question is whether the Committee has stated a colorable claim, and the Court concludes it has. And further, even without the marshaling claim, the conclusion is inescapable that the Committee has alleged colorable claims that would benefit the estate if proven after full development of the record.

The Court therefore concludes the Committee has satisfied the prerequisite for derivative standing that the claims sought to be undertaken are colorable, and the remaining requirement for derivative standing requires the Committee to show Debtor's refusal to bring these claims was unjustifiable. Some circuits conclude that if the claims to be brought via

---

[64] Doc. 280 p.14-15.
[65] Doc. 321 p. 3-4.

derivative standing are colorable, then the refusal to pursue them makes it unjustified.[66] In other circuits, more is required, and the movant seeking derivative standing must show "specific reasons" why the refusal to bring the claims is unjustified.[67] This Court previously sided with the courts requiring a movant to give these "specific reasons."[68]

Regardless of which standard is used to determine if Debtor's refusal to bring claims is unjustified, the standard is met here. The Court has already concluded the proposed clams are colorable. The clams are not frivolous and if successful will benefit the bankruptcy estate by bringing funds back into the estate for distribution to creditors. Debtor refused to pursue the actions, and in fact, Debtor agreed in the Fifth Interim Order on cash collateral that it

---

[66] *E.g.*, *In re Canadian Pac. Forest Prods., Ltd., v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1439–40 (6th Cir. 1995) ("[W]e believe that a creditor need not plead facts alleging the debtor-in-possession's reason or motive for the inaction, but may meet its burden to allege unjustified inaction through notice pleading by alleging the existence of an unpursued colorable claim that would benefit the estate. If the debtor-in-possession gives no reason for its inaction when a demand is made, the bankruptcy court may presume that its inaction is an abuse of discretion ('unjustified') if the complaint alleges a colorable claim.").

[67] *E.g.*, *In re Racing Servs., Inc.*, 540 F.3d at 900 ("To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy court with specific reasons why it believes the trustee's refusal is unjustified. A creditor thus does not meet its burden with a naked assertion that 'the trustee's refusal is unjustified.' If presented with nothing more than this, the bankruptcy court may properly deny a creditor's motion without explanation. The creditor, not the bankruptcy court, has the onus of establishing the trustee unjustifiably refuses to bring the creditor's claim.").

[68] *In re Terra Bentley II, LLC*, 2011 WL 808190, at *4 (concluding that "to show that the trustee or debtor-in-possession abused its discretion by unjustifiably refusing to pursue the proposed claims," a committee must give "specific reasons why the refusal is unjustified").

would waive pursuit of any claims as a condition of Central Bank agreeing to that Order. Debtor's management is in flux with the recent resignation of Mr. Niles. The Court concludes the Committee has carried its burden to show the refusal to bring the claims was unjustified, and also concludes the cost-benefit analysis of bringing the claims weighs in favor of granting the motion.

## III. Conclusion

The Committee's motion for derivative standing is granted.[69] The Committee is authorized to bring its proposed complaint and litigate those claims to final judgment.

**It is so Ordered.**

### #

---

[69] Doc. 280. To the extent the Committee seeks additional relief in its motion beyond authority to file its claims via derivative standing, including the disallowance of Central Bank's claims under § 502(c), the Court concludes that relief is premature and inappropriate at this juncture.

Case 21-10495    Doc# 359    Filed 10/19/21    Page 27 of 27